Affirmed and Memorandum Opinion filed September 30, 2003














Affirmed and Memorandum
Opinion filed September 30, 2003.                                                     

 

 

 

 

 

 

 

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-03-00229-CV  

____________

 

IN THE INTEREST OF
K.W. AND C.G., III

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



On Appeal from 272nd District Court

                                                           Brazos
 County, Texas                       

Trial Court Cause
No. 7955-CV




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 

 



M E M O R
A N D U M   O P I N I O N

            T.K. appeals from a trial court
order terminating her parental rights to one of her children, C.G., and limiting
her visitation rights to another, K.W.[1]  T.K. is the biological mother of both
children.  Because all dispositive issues are clearly settled in law, we issue
this memorandum opinion.[2]

            A court may order termination of the
parent-child relationship if the court finds by clear and convincing evidence
that the parent has engaged in certain listed conduct and termination is in the
best interest of the child.[3]  T.K. does not challenge the trial court’s
finding that termination would be in C.G.’s best
interests.  Instead, she challenges the factual
sufficiency of the trial court’s two grounds for termination (either of which
standing alone is sufficient): (1) T.K. engaged in conduct, or knowingly placed
C.G. with persons who engaged in conduct, that endangered the physical or
emotional well-being of the child, and (2) T.K. failed to comply with
provisions of an earlier order establishing requirements for the return of C.G.[4]  The evidence is factually insufficient only
if, after resolving disputed evidence in favor of the court’s finding if a
reasonable person could have found it to be clear and convincing, there is
evidence remaining that is both contrary to the finding and so significant that
a factfinder could not reasonably form a firm belief
or conviction that the grounds for termination had been established.[5]

            Regarding the first ground, the
record contains considerable evidence of T.K.’s
violent behavior and surroundings.  A
series of police officers testified regarding seven recent incidents of
domestic violence in which she was involved.[6]  Although in most cases the police did not
recall whether children were present, they did report the presence of small
children on at least two occasions.

            The record also contains evidence of
the children’s physical well-being while in T.K.’s
care.  The first foster mother for C.G.
and K.W. testified K.W. told her T.K. burned them with cigarettes.  The foster mother and a nurse testified C.G.
had a burn on his chest and a badly infected toe, and K.W. had burns on her
ankles.  The nurse opined that failing to
obtain treatment for the infected toe constituted child neglect.  C.G.’s subsequent
foster mother testified about an incident in which C.G. was burned on the head
by candle wax during a visit with his mother, explaining that C.G. seemed more
upset by T.K.’s “yelling and screaming” than by the
actual burn.  A psychologist who treated K.W.
testified that in her play-therapy K.W. depicted scenes of domestic violence
and of children being physically disciplined and burned.[7]

            The record further contains evidence
of C.G.’s developmental delays.  A licensed professional counselor testified that
evaluations of C.G. showed him to be significantly delayed in language,
self-help, and social development skills, and did not appear to have any
hearing or neurological problems that could account for the delays.[8]  Additionally, the counselor noted C.G. often
showed no response to pain stimuli, a condition for which there was no medical
explanation.  C.G.’s
speech therapist testified she had seen little improvement in C.G.’s communication skills, and he would need intense
therapy for an extended time.  C.G.’s current foster mother testified unfamiliar
situations could lead to “complete meltdowns” by C.G., wherein he would at
first “shut down” and become fixated on a familiar object but if it was taken
away he would throw a temper tantrum.

            In response, T.K. points to evidence
that she appeared nurturing and caring during supervised visits with C.G., was
not responsible for some of the violent incidents reported by the police, and that
C.G.’s developmental problems may have occurred while
he was in foster care.[9]  But the proof of occasional nurture does not
overwhelm the proof of occasional violence, nor does her lay opinion regarding
the source of C.G.’s problems overwhelm that of the
caregivers’ opinions to the contrary. 
And the Family Code does not require a showing that T.K. intentionally
engaged in violence in an effort to harm the children; it is enough that she
engaged in conduct (no matter who started it) endangering the physical or
emotional well-being of C.G.  Resolving all
evidentiary disputes in favor of the trial court’s findings, we find T.K.’s evidence is not so significant as to prevent a factfinder from reasonably forming a firm belief that this
ground for termination had been established. 
T.K.’s first two issues are overruled.

            Regarding the additional ground for
termination, the Family Service Plan approved by the court required T.K. to (1)
participate in individual counseling, (2) maintain a stable employment, (3)
attend parenting classes and demonstrate appropriate interactions with her
children, (4) cooperate with CPS and refrain from criminal activity, (5) participate
in a drug and alcohol assessment and follow recommendations, and (6) maintain
proper housing.[10]

            In her brief, T.K. acknowledges she
“had difficulty” completing tasks one and two. 
Indeed, the evidence indicated she failed to attend any individual
counseling sessions, and she admitted she was employed only five out of
seventeen months prior to trial.  T.K. asserts
she “substantially completed” tasks three and four, but the evidence
demonstrated she attended fewer than half the scheduled parenting classes, and the
police were called to the scene of three separate domestic disturbances in
which she was involved after the service plan’s effective date.[11]  Additionally, police investigating a burglary
were informed the stolen property might be located in T.K.’s
apartment.  Police entered the apartment
and arrested T.K.’s brother.  T.K. finally contends she “successfully
completed” tasks five and six.  However,
she does not cite to any evidence supporting this contention.

            In response, T.K. asserts she was
unable to attend many of the counseling and training sessions because of
scheduling conflicts and the birth of a third child.  But it was undisputed that most of those
conflicts could not have related to employment (as she usually was unemployed),
and there is no evidence other than her say-so to support any other conflicts.  Again resolving all evidentiary disputes in
favor of the trial court’s findings, we find T.K.’s
evidence is not so significant as to prevent a factfinder
from reasonably forming a firm belief that this ground for termination had also
been established.  T.K.’s
second two issues are overruled.

            In her fifth issue, T.K. contends there
was factually insufficient evidence to support any other ground for
termination.  As no other grounds appear
in the trial court’s order, this complaint presents nothing for review, and is
overruled.

            In her final issue, T.K. contends
the trial court erred in giving a third party (K.W.’s
paternal grandmother, appointed Sole Managing Conservatorship
of K.W.) discretion to determine the length, frequency, and timing of T.K.’s visitation with K.W. 
The record does not reflect that T.K. ever made a timely objection to
this order in the trial court.[12]  Additionally, although the courts of appeal
are in disagreement over the validity of such orders generally,[13] there
appears to be agreement that a court may deny, restrict, or limit the
possession of a child in this manner where there is a previous history of
family violence.[14]  As noted above, that exception applies here.

            The judgment of the trial court is
affirmed.

 

 

/s/        Scott Brister

                                                                                    Chief Justice

 

Judgment
rendered and Memorandum Opinion filed September
 30, 2003.

Panel
consists of Chief Justice Brister and Justices Anderson and Seymore.











[1]
C.G. is a male born on August 23, 2000.  K.W. is a female born on October 6, 1998.  A third child born later is not involved in
these proceedings.

 





[2] See Tex.
R. App. P. 47.4.

 





[3] Tex. Fam. Code § 161.001; In re C.H., 89 S.W.3d 17, 23 (Tex.
2002).

 





[4] See Tex.
Fam. Code § 161.001(E), (O).

 





[5] See In re J.F.C., 96 S.W.3d 256, 266 (Tex.
2002).

 





[6] In
March 2000, an officer responded to a fist fight between T.K. and her sister;
on January 15, 2001, an officer arrested T.K. for injuring her sister; on April
30, 2001, appellant wielded a stick in a fight involving several members of her
family; on June 2, 2001, appellant and her brother drew knives on each other
during a fight; on May 25, 2002, appellant was beaten by C.G.’s
father, who claimed T.K. had hit him on the head with a beer bottle; on
November 15, 2002, T.K. and her sister got into a fight; on November 30, 2002,
appellant and her sister were assaulted by C.G.’s father.  Additionally, on July 5, 2002, T.K.’s brother was arrested in her apartment after police were
called, although T.K. herself was apparently not present at the time.  T.K.’s sister once
told the police that the two “get into verbal disputes quite frequently.”

 





[7] K.W.’s play also depicted sexual acts; however, because the
record contains the suggestion she was molested by another child in a foster
home, these sexual depictions cannot necessarily be ascribed to her time in T.K.’s care.

 





[8]
Specifically, when C.G. was tested at twenty-two months old, he was shown to
have the expressive and receptive language skills of a nine- to twelve-month
old, and the play and interpersonal relationship skills of a five- to six-month
old.  Although the counselor could not
put an age range on his self-help development, she said he could not use
utensils and did not seem aware of when he needed to urinate, suggesting a
delay in self-help development.  The
counselor further stated she saw little improvement between the date of the
evaluation and the date of trial (about six months later).  An MRI was performed but showed no brain
abnormalities.

 





[9]
T.K. states that an evaluation of C.G. done immediately after his removal from T.K.’s home, showed no developmental delays.  However, this assertion is not supported by
any evidence in the record

 





[10]
The trial court’s temporary orders required T.K. to comply with each task in
the service plan in order to obtain the return of the children, and stated that
failure to fully comply could result in termination of parental rights.  Curiously, the tasks listed by the parties in
their respective briefs vary somewhat from the tasks in the service plan.  Neither party provides explanation or
citation for their list of tasks.  At one
point the parties entered into a mediated settlement agreement that purported
to list terms and conditions for reunification, similar but not identical to
those listed above.  However, there is no
indication in the record the trial court approved or adopted the agreement, nor
is there any notation in the agreement that failure to fulfill the terms and
conditions could result in termination of parental rights.  Accordingly, it is the terms of the Family
Service Plan, as referenced by the trial court, that we review in this appeal.

 





[11]
Regarding one of the disturbances, the officer testified he was told T.K. hit C.G.’s father with a beer bottle.  In another disturbance, T.K. was accused of
fighting with her sister.  In the last
incident, appellant was assaulted by C.G.’s father.  Obviously, only the first two could be
interpreted as illegal activity on T.K.’s part.

 





[12] See Tex.
R. App. P. 33.1(a)(1).

 





[13] See in re R.D.Y., 92 S.W.3d 433 (Tex.
2002) (Hecht, J., dissenting to denial of rehearing on petition for review).

 





[14] See Tex.
Fam. Code § 153.004(c); Roosth v. Roosth, 889 S.W.2d 445, 451 (Tex. App.—Houston [14th
Dist.] 1994, pet. denied) (disapproving of such orders “except in extreme cases
of unfitness”).